**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| In the Matter of: | **Chapter 11** |
| **LEGACY ENTERPRISES OF** | **Case No.: 24-03477-5-JNC** |
| **NORTH AMERICA, LTD** | |
| Debtor | |

<u>**MOTION FOR ORDER DIRECTING**</u>
<u>**R1 TRUCK REPAIR AND**</u>
<u>**YANKEE FREIGHT, LLC,**</u>
<u>**TO APPEAR AND SHOW CAUSE**</u>

NOW COMES Legacy Enterprises of North America, LTD ("Debtor") by and through undersigned counsel of record, and respectfully requests that the Court enter an order directing R1 Truck Repair ("R1") and Yankee Freight ("Yankee") (collectively R1 and Yankee, may be referred to as the "Possessing Parties"); to appear and show cause as to why each should not be found in contempt or otherwise sanctioned. In support of this Motion, Debtor shows unto the court the following:

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 151, 157, and 1334. This matter is a core proceeding pursuant to 28 U.S.C. §157, and the Court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334. The Court has the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984, by the United States District Court for the Eastern District of North Carolina.

2.      On or about October 4, 2024, Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Petition Date") [Doc. No. 1].

3.      R1 and Yankee were served with the Petition.

4.      On October 8, 2024, BMO Harris Bank ("BMO") filed a secured claim [Clm. No. 1] in the amount of $47,517.99 asserting a lien on trucks ending in VIN Nos. 4067 and 4059.

5.      On October 22, 2024 Hunting National Bank ("Huntington") filed a secured claim in the amount of $292,415.81, asserting a lien on trucks ending in VIN Nos. 5808, 5810, 5812. [Clm. No. 3]

6.      Debtor is party to an unexpired pre-petition contract with Yankee for the leased use of a 2015 Cascadia freightliner truck ending in VIN 1203 ("2015 C Freightliner"). Debtor leased the

2015 C Freightliner to Yankee and as part of that lease agreement provided Yankee with title to the 2015 C Freightliner.  A true and accurate copy of the Yankee Lease is attached hereto as **Exhibit A**.

       7.      As of this filing of this Motion, none of the Possessing Parties have filed a Proof of Claim.

       8.      On November 20, 2024, Debtor filed a Motion for Turnover of Property of the Bankruptcy Estate (the "R1 Turnover Motion"). [Doc. No. 31]

       9.      No Responses to the R1 Turnover Motion were filed.

       10.     On December 11, 2024, the Court entered its Order Granting the R1 Turnover Motion (the "R1 Turnover Order"). [Doc. No. 38]

       11.     The R1 Turnover Motion requests and the R1 Turnover Order orders the turnover of property of the estate, including the following 2017 Freightliner trucks:

      VIN 3AKJGLDR6HDHN5808,

      VIN 3AKJGLDR4HDHN5810,

      VIN 3AKJGLDR8HDHN5812,

      VIN 3AKJGDR7HSHU4067, and

      VIN 3AKJGLDR8HSHU4059

(The Freightliner trucks with VINs ending in 5810, 5808, 582, 4067, and 4059 may be referred to collectively hereinafter as the "Seized Trucks").  Huntington has a lien on three of the Seized Trucks ending in VINs 5808, 5810, and 5812.   BMO has a lien on the Seized Trucks ending in VINs 4059 and 4067.

       12.     The time in which to appeal the R1 Turnover Order has run and no appeal has been taken from this Court.

       13.     On information and belief the Possessing Parties are related companies in that they share a physical site location, and they share an office space.  A true and accurate photograph of the shared office space and site location is attached hereto as **Exhibit B.**

       14.     On further information and belief, the Possessing Parties continue to retain possession and control of all of the "Seized Trucks," owned by Debtor and property of the bankruptcy estate, for the benefit of BMO, Huntington, and/or Yankee.

       15.     Debtor has no knowledge as to why or how Yankee is in possession and/or control of any of its Freightliners, other than the 2015 C Freightliner, which is not among the Seized Trucks.

16.     On Friday, December 27, 2024, at 4.25 p.m. Debtor spoke with Nikola Radojlovic ("Mr. Radojlovic"), who holds himself out as being the owner of Yankee along with a partner or associate who is referred to as "Nik." Mr. Radojlovic informed Debtor that a third-party, who he would not disclose, was negotiating recovery of the Seized Trucks between BMO and Huntington.

17.     Also on Friday, December 27, 2024, Mr. Radojlovic referred Debtor to the purported manager of R1, Nemo. Debtor has previously communicated with Nemo in person and via text message, and Nemo has consistently claimed to have no information about the Seized Trucks and has further indicated to Debtor that he does not wish to discuss the Seized Trucks with Debtor.

18.     Debtor has personally witnessed all of the Seized Trucks on site at the R1 location in Broadview, Illinois ("R1 Site"). Photographs taken by the Debtor on November 11 and 13 at the R1 Site demonstrate that the trucks ending in VINs 5810, 5808, and 4059 are located at the R1 Site. True and accurate photographs of the Seized Trucks are attached hereto **Exhibits C** through **F**.

19.     The R1 Site acts as a truck service yard for Yankee. All Possessing Parties have access to the Seized Trucks.

20.     On information and belief, Yankee has access to and control of the Seized Trucks.

21.     On information and belief, Yankee is utilizing the Seized Trucks by allowing other businesses/truck drivers access and use for purposes that do not benefit the Debtor or the bankruptcy estate, including diminishing their value via adding mileage and general wear and tear.

22.     On further information and belief, some of the Seized Trucks have been re-branded with "Yankee" insignia. Debtor has seen two of the R1 Trucks with Yankee insignia, including the truck ending in VIN 5810.

23.     On information and belief, Yankee along with R1 are actively working to hide and utilize Debtor's assets and property of the bankruptcy estate, at the R1 Site.

24.     As of the date of this pleading, R1 has refused to turnover Debtor's assets in violation of the R1 Turnover Order.

25.     On information and belief, Possessing Parties are retaining possession of the Seized Trucks in bad faith.

26.     On further information and belief, Possessing Parties are acting to deceive Debtor and this Court, by hiding these assets from Debtor and allowing others access to and use of the Seized Trucks for the benefit of Possessing Parties.

27.     Section 105(a) of the Bankruptcy Code authorizes bankruptcy courts to issue orders

or make any determination necessary to enforce, implement, or prevent an abuse of the provisions of

the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.  See *Marrama v. Citizens*

*Bank of Mass.*, 549 U.S. 365 (2007) (holding that § 105(a) grants bankruptcy courts "broad authority

. . . to take any action that is necessary or appropriate 'to prevent an abuse of process.'" (citation

omitted); 11 U.S.C. § 105(a).  "This includes the issuance of sanctions for violation of a court

order[.]" *In re Kirkbride*, Case No. 08-00120-8-JRL, 2010 WL 4809334, at *3 (Bankr. E.D.N.C.

Nov. 19, 2010) (citing *In re Adams*, 2010 WL 2721205, at *4 (Bankr. E.D.N.C. July 7, 2010) aff'd,

No. 5:10-CV-340-BR (E.D.N.C. Jan. 24, 2011)).

28.     Apart from § 105(a) and similar to their Article III counterparts, bankruptcy courts

"enjoy inherent power to sanction parties for improper conduct." *Mapother & Mapother, P.S.C. v.*

*Cooper (In re Downs)*, 103 F.3d 472, 477 (6th Cir. 1996).  Pursuant to its inherent contempt powers,

a bankruptcy court may sanction conduct "which abuses the judicial process." *Chambers v. NASCO,*

*Inc.*, 501 U.S. 32, 44-45 (1991).  Conduct abusive of the judicial conduct includes "bad faith

conduct" and "willful disobedience of a court order."  *Id.* at 45-46; *see Barnes v. Dalton*, 158 F.3d

1212, 1214 (11th Cir. 1998) (emphasizing that, in addition to vexatious, wanton or oppressive

conduct, bad faith conduct includes "hampering enforcement of a court order").

29.     Bankruptcy courts "have inherent contempt powers in all proceedings, including

bankruptcy, to 'achieve the orderly and expeditious disposition of cases.'" *Jove Eng'g, Inc. v. IRS*

*(In re Jove Eng'g, Inc.)*, 92 F.3d 1539, 1553 (11th Cir. 1996) (citation omitted).  To enforce and

carry out the provisions of their orders and the Bankruptcy Code, courts have the authority to

"issu[e] sanctions in the form of 'actual damages, attorney's fees, and when appropriate, punitive

damages.'"  *Kirkbride*, 2010 WL 4809334, at *3 (quoting In re Cherry, 247 B.R. 176,187 (Bankr.

E.D. Va. 2000)); see, e.g., *Am. Airlines Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir. 2000)

("Judicial sanctions in civil contempt proceedings, may in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained.").

30.    Possessing Parties' concerted efforts to violate the Court's R1 Turnover Order are egregious, eviscerating the size and capacity of Debtor's trucking fleet from five operating freightliners down to one operating freightliner.

31.    Possessing Parties are not in the military service.

32.    Possessing Parties are not infants, incompetent persons, or otherwise under disability.

33.    There is no fair ground of doubt that that the failures of Possessing Parties, detailed herein, violate the orders of this Court. *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019); accord *Beckhart v. Newrez LLC*, 31 F.4th 274 (4th Cir. 2022).

34.    Possessing Parties have engaged and will continue to engage in conduct demonstrating a willful disregard for the orders of this Court.

35.    Based upon the foregoing, and for the reasons set forth herein, Debtor is entitled to entry of an Order requiring Possessing Parties to appear and show cause as to why they should not be held in contempt and have sanctions imposed by the Bankruptcy Court based upon their willful, continued, and ongoing failure to comply with the terms and provisions of the R1 Turnover Order.

**WHEREFORE**, Debtor prays of the court the following:

1.    That the Court enter an Order directing that R1 appear and show cause as to why it failed to comply with the R1 Turnover Order;

2.    That the Court enter an Order directing that Yankee appear and show cause as to why it should not be held in civil contempt;

3.    That the Court award attorney's fees to Debtor as provided by law;

4.    That the costs of this action and in prosecuting this Motion to Show cause be taxed against the Possessing Parties; and

5.      For such other and further relief as the court deems just and proper.

This the 6th day of January, 2025.

The Law Offices of Oliver & Cheek, PLLC

By:      s/George M. Oliver
         George M. Oliver
         N.C. State Bar No. 26587
         Email:  george@olivercheek.com
         PO Box 1548
         New Bern, NC  28563
         Telephone: (252) 633-1930
         Facsimile:  (252) 633-1950
         *Attorneys for the Debtor*

<u>**CERTIFICATE OF SERVICE**</u>

I, George Mason Oliver, Post Office Box 1548, New Bern, North Carolina 28563, certify:

That I am, and at all times hereinafter mentioned was, more than eighteen (18) years of age;

That on the 6th day of January, 2025, I served copies of the foregoing Motion on the parties listed below via CM/ECF or U.S. Mail, First Class, sufficient postage pre-paid, as indicated; and

I certify under penalty of perjury that the foregoing is true and correct.

This the 6th day of January, 2024.

The Law Offices of Oliver & Cheek, PLLC

By:    <u>s/George M. Oliver</u>
George M. Oliver
N.C. State Bar No. 26587
Email:  george@olivercheek.com
PO Box 1548
New Bern, NC  28563
Telephone: (252) 633-1930
Facsimile:  (252) 633-1950
*Attorneys for the Debtor*

To:

| | |
|---|---|
| Bankruptcy Administrator | (via CM/ECF) |
| | |
| Joseph Z. Frost<br>*Sub Chapter V Trustee* | (via CM/ECF) |
| | |
| Yankee Freight Systems, LLC<br>Attn: Managing Agent<br>2717 S. 13th Ave.<br>Broadview, IL 60155 | (via U.S. Mail) |
| | |
| R1 Truck Repair<br>Attn: Managing Agent<br>2717 S. 13th Street Ave.<br>Broadview, IL 60155 | (via U.S. Mail) |

## LEASE AGREEMENT BETWEEN YANKEE FREIGHT SYSTEMS LLC AND INDEPENDENT CONTRACTOR (OWNER/OPERATOR)

### I.      IDENTIFICATION OF INDEPENDENT CONTRACTOR

NAME: *Legacy Enterprises of N.A.*

STEET ADDRESS: *809 Taylor St*

CITY, STATE, ZIP: *Windsor, NC 27983*

SS#/FED ID#: *45-2431716*

### II.      Agreement of the Parties

For and in consideration set forth in Section III of this agreement, hereinafter called INDEPENDENT CONTRACTOR agrees to pay contract to YANKEE FREIGHT SYSTEMS LLC , hereinafter called CARRIER, the equipment described inSection XIV together with qualified drivers, and CARRIER agrees to contract loading and transport of freight withINDEPENDENT CONTRACTOR.

In witness whereof, CARRIER and INDEPENDENT CONTRACTOR hereby enter into this Agreement this *2/24/24* which shall be effective on the date executed and agree to be bound by the terms and conditions.

thereof set forth in the attached schedules, which is made a part hereof the same as if it were fully set forth herein. The terms of this Agreement shall commence on the date set forth above and continue for twelve (12) consecutive months from such date, unless terminated by one or both parties for breach and otherwise. This Agreement shall be automatically renewed for one (1) year, unless either party shall, at least thirty 2 weeks prior to the expiration of any term, give written notice of the intent not to renew the Agreement.

*D. D. Little (P)*

Signature of INDEPENDENT CONTRACTOR

*Pavic R.*

Signature of CARRIER'S authorized Representative

INITIALS *DR*

YANKEE FREIGHT SYSTEMS LLC
2911 S 19TH AVE
Broadview, IL, 60155
Tel: 708-523-0550   Fax: 708-897-8924

## III.  SCHEDULE OF COMPENSATION

CARRIER agrees to pay 88% of load pay offered, minus applicable escrow deductions, cargo & liability insurance, cash advances, fines, violations, damage payments, deductibles, fuel card payments and any/all agreed upon damage/payments.

1). CARRIER agrees to pay, and INDEPENDENT CONTRACTOR agrees to accept, as full and complete payment for use of said equipment and for performance or obligation accepted by INDEPENDENT CONTRACTOR under this AGREEMENT, compensation as set forth in Section III. Above. CARRIER shall settle with INDEPENDENT CONTRACTOR on each Friday within eleven days of proper submission, by INDEPENDENT CONTRACTOR, of the Bills of Lading, signed delivery receipts, lumper receipts, assessorial charge receipts, paper logs for each complete trip. Original fuel receipts are also due at the same time as the load paperwork from all INDEPENDENT CONTRACTORS (for use in preparation of IFTA) regardless of whether they choose to use the company provided Fuel Tax accounting services or not. All applicable paperwork must be submitted to CARRIER no later than **11:59 C.S.T** the preceding Wednesday in order to be paid on time, **NO EXCEPTIONS.** If COMPLETE paperwork is not TIMELY submitted, INDEPENDENT CONTRACTOR acknowledges and agrees that they will not be paid until such time as the COMPLETE paperwork, for all required or remaining loads, is turned in and acknowledged as received by the CARRIER. If any error in payment of the revenue statement occurs in any week, INDEPENDENT CONTRACTOR authorizes the CARRIER to automatically withdraw back any sums overpaid in error.  Payments are made by our outside accounting service.

2). Fuel Use Tax Return services will be available to an INDEPENDENT CONTRACTOR. If this service is selected by the INDEPENDENT CONTRACTOR, he agrees to weekly send fuel receipts/reports. If he fails to do so the CARRIER reserves the right to withhold paychecks, apply charge for missing fuel reports. If this service is not selected by INDEPENDENT CONTRACTOR the quarterly Fuel Use Tax, Road Tax, Weight and Distance Tax and all similar taxes/fees will remain the full responsibility of the INDEPENDENT CONTRACTOR. If INDEPENDENT CONTRACTOR refuses the Fuel Use Tax Return services offered by CARRIER, then INDEPENDENT CONTRACTOR is required to provide a copy of the paid FUEL USE RETURN for EACH QUARTER to the CARRIER.  If  INDEPENDENT  CONTRACTOR  does not submit the copy of the Fuel Use Return for each quarter to the CARRIER by the 25th day of the month when taxes are due, the CARRIER will file the Fuel Use Tax Return for INDEPENDENT CONTRACTOR for that quarter and additional charges will be deducted from INDEPENDENT CONTRACTOR'S settlement. Upon termination of this Agreement, INDEPENDENT CONTRACTOR authorizes the CARRIER to withhold the escrow funds for up to 45 days from the INDEPENDENT CONTRACTOR'S resignation or the termination of the Agreement by CARRIER (until the next Quarterly Fuel Use Tax Return has been filed.  After the Fuel Use Tax Return charges are covered, the adjustment will be made and the difference left from the escrow funds, not otherwise needed or used for any other fees, fines, violations or damages, will be returned to INDEPENDENT CONTRACTOR. All the road tax additional charges and fees will be the full responsibility of the INDEPENDENT CONTRACTOR regardless of whether prepared by the CARRIER'S accounting department or outside by INDEPENDENT CONTRACTOR'S own accounting service.

INITIALS 

**YANKEE FREIGHT SYSTEMS LLC**
2717 S 13TH AVE
Broadview, IL, 60155
Tel: 708-523-0550  Fax: 708-897-8924

PLEASE CHECK ONE:

___I CHOOSE TO FILE MY OWN IFTA AND TO FILE MY OWN MOTOR FUEL USE TAX RETURNS.

✓ I CHOOSE TO USE CARRIER'S IFTA AND CARRIER TO FILE MY MOTOR FUEL USE TAX

RETURNS.

3.) It is agreed that an "Escrow" fund is to be $2500.00

INDEPENDENT CONTRACTOR authorizes CARRIER to withhold this escrow account payment from their future settlements. If for anyreason CARRIER fails to withhold, in any given week, the deduction, INDEPENDENT CONTRACTOR authorizes CARRIER to withhold any deficiency in any subsequent week in addition to that week's required deduction. If INDEPENDENT CONTRACTOR fails to keep his equipment operating for the full term of the Agreement, the minimumfee paid to any regulating agency to certify such equipment, or drivers, maybe deducted from the sums held in escrow. ALL escrow funds may be held for a minimum of 45 days after termination of the Agreement (by either party and for any reason) to ensure payment of INDEPENDENT CONTRACTOR'S obligations, including quarterly Fuel Tax Returns, cargo claims, liability claims, advances, equipment rental costs, fuel card advances, fuel or any other costs which are the sole responsibility of INDEPENDENT CONTRACTOR. Should any claim not be received at the end of the stated 45- day minimum time to release escrow, but CARRIER has been made aware that such a claim shall or might be forthcoming, CARRIER is authorized to hold the remaining escrow funds not yet applied for such time as thepotential or upcoming claim is paid and closed fully and finally with any/all required releases executed. CARRIER will provide to INDEPENDENT CONTRACTOR with an accounting of any transactions made from or using the escrow funds upon the written request of INDEPENDENTCONTRACTOR to CARRIER. If for any reason INDEPENDENT CONTRACTOR terminate this Agreement with or without notice, before the escrow fund in amount of $2500.00 is reached, the rest of the escrow amount will be charged in full from the next paycheck.

4. In any case where the INDEPENDENT CONTRACTOR has secured an advance of any kind from CARRIER including, but not limited to, fuel, lubricants, pallets, safety equipment, tires, tractor or trailer parts, fines and penalties by operating authorities, licenses, permits, transfer charges, tolls or any insurance deductions authorized by INDEPENDENT CONTRACTOR, CARRIER shall be authorized to deduct the amount of such advance(s) from any trip settlement or other monies due. If such monies are insufficient to cover the sum(s) due to CARRIER from INDEPENDENT CONTRACTOR, then INDEPENDENT CONTRACTOR will be required to pay to CARRIER all such remaining sums due,and CARRIER shall furnish a written explanation and/or itemization of all such deductions due upon demand, to INDEPENDENT CONTRACTOR upon INDEPENDENT CONTRACTOR'S written request to CARRIER.

5. If INDEPENDENT CONTRACTOR does not notify CARRIER fourteen (14) days prior to terminating this Agreement, CARRIER reserves the right to hold all money owed to or owned by INDEPENDENT CONTRACTOR.

INITIALS DAG

6. CARRIER reserves the right to terminate this Agreement, for any reason whatsoever, at its sole discretion.

### IV.    RELATIONSHIP OF THE PARTIES

1). The parties further intend to create, by this Lease Agreement, the relationship of a CARRIER and INDEPENDENT CONTRACTOR only, and recognize and acknowledge that INDEPENDENT CONTRACTOR, at no time whatsoever, is an employee or servant of the CARRIER nor its agents, clients, brokers or assigns.

2.) INDEPENDENT CONTRACTOR shall operate equipment covered by the Agreement or furnish sufficient qualified and certified employee or Contract Drivers to operate said equipment. Any employees or Contract Drivers furnished by INDEPENDENT CONTRACTOR shall be his/her employees; and shall be hired, directed, paid and controlled solely by INDEPENDENT CONTRACTOR. INDEPENDENT CONTRACTOR represents that any employees/Contract Drivers furnished by him/her are competent, reliable, physically fit and are familiar with State and Federal Motor Carrier Safety Rules, laws and regulations. To the extent required by applicable law, INDEPENDENT CONTRACTOR must maintain Workmen's Compensation OR Occupational Accident Coverage for all employees/contract drivers, and shall provide proof the same to CARRIER. INDEPENDENT CONTRACTOR agrees to hold harmless and indemnify CARRIER and any of its affiliates, agents, employees, heirs and assigns against any award by a worker's compensation OR occupational accident court or similar administrative body of law or applicable agency. INDEPENDENT CONTRACTOR shall be responsible for any/all withholding and remittance to proper authorities of all payroll taxes for his/her employees.

3) CARRIER will provide a Statement of Earnings to INDEPENDENT CONTRACTOR showing annual compensation and will report same to the Internal Revenue Service on IRS Form1099.

4.) INDEPENDENT CONTRACTOR may temporarily remove leased equipment from operation of the CARRIER under this Agreement for periods of less than thirty (30) days, subject to notification of and approval by CARRIER. During such periods, INDEPENDENT CONTRACTOR shall remove the CARRIER identification placards, cards and fuel permits; and shall not operate, in any manner whatsoever, under the authority of the CARRIER or their signs.

INITIALS 

**YANKEE FREIGHT SYSTEMS LLC**
**2717 S 13TH AVE**
**Broadview, IL, 60155**
**Tel: 708-523-0550  Fax: 708-897-8924**

5.) The parties further intend that the relationship created by this Agreement comply, in all respects, with the regulations of the ICC governing the Agreement and interchange of vehicles by Authorized carriers. This Agreement made between INDEPENDENT CONTRACTOR and CARRIER is for the performance of trucking services (loading, driving, unloading, etc) to be performed without the supervision of CARRIER except to the extent that the services are being provided/leased out to CARRIER'S customer and clients and any rules and regulations regarding these customers/clients will be relayed to INDEPENDENT CONTRACTOR and/or their employees/contract drivers. INDEPENDENT CONTRACTOR agrees that any/all payment for services will be rendered ONLY after COMPLETE AND TIMELY paperwork is submitted to CARRIER; and that those settlements will NOT be subjectto withholding of Federal and State Income or Social Security tax, pursuant to the issuance of Form 1099 to INDEPENDENT CONTRAACTOR from CARRIER.

### a.    INDEPENDENT CONTRACTORS WARRANTY AND REPRESENTATION:

1.)   INDEPENDENT CONTRACTOR warrants and represents that it is the owner of every unit of leased equipment; and that CARRIER shall have possession of the equipment during the term of this Agreement. INDEPENDENT CONTRACTOR further warrants that the equipmentfurnished shall be in safe, mechanical operation and condition, free of defects, properly licensed and in full compliance with the Motor Carrier Safety Regulations of the U.S. Department of Transportation and all other applicable laws, regulations and ordinance of Federal, State or Municipal authorities having jurisdiction as of the date it is delivered to CARRIER, and shall be maintained as such throughout the term of this Agreement.

2.) INDEPENDENT CONTRACTOR further warrants and represents that the employees/contract driver's they supply to perform services for CARRIER, shall be properly licensed and qualified under all applicable laws and regulations throughout the period of this Agreement.

### b.  OPERATING AND MAINTENANCE EXPENSES

INDEPENDENT CONTRACTOR agrees to pay the entire costs of operating and maintaining his own equipment throughout the term of the Agreement. For the equipment that the INDEPENDENT CONTRACTOR is leasing from CARRIER, INDEPENDENT CONTRACTOR will be responsible for any damages caused to the leased equipment caused by negligence. The routine maintenance of the leased equipment will be paid by the CARRIER. INDEPENDENT CONTRACTOR'S obligations shall include, but shall not be limited to, the following expense items:

INITIALS DAC

**YANKEE FREIGHT SYSTEMS LLC**
**2717 S. 13TH AVE**
**Broadview, IL, 60155**
**Tel: 708-523-0550   Fax: 708-897-8924**

1.) All wages, payroll taxes, Worker's Comp or Occ/Acc Insurance and any/all other payments with respect to INDEPENDENT CONTRACTOR'S employment of authorized drivers and/or any other labor;

2.) All costs of Non-Trucking Liability and Physical Damage Insurance. Proof of said insurance must be provided to CARRIER prior to completion of this Agreement;

3.) All expenses for repair of the leased equipment if any damages are caused due to negligence and not normal wear and tear;

4.) All Fuel and Highway Use taxes, all highway, bridge and ferry tolls, and all expenses of acquiring and maintaining current vehicle base plates and licenses on leased equipment;

5.) All fines for traffic violations and any other fees, penalties, fines or taxes that may be assessed against the equipment or the services provided by the INDEPENDENT CONTRACTOR or his agents or employees/contract drivers;

6.) INDEPENDENT CONTRACTOR shall be solely responsible for all expenses incurred in the procurement of the background checks, physical examinations, and drug tests of all current or prospective employees/contract drivers in accordance with the DOT and Federal Motor Carrier Safety Administration's safety regulations (391.31)

        A.) Drug tests are required randomly as required by the U.S. Department of Transportation;

        B.) Background check of CDL license records must be completed before any driver will be allowed to work under the terms of this Agreement.

CARRIER shall obtain and pay for Road Use and Fuel Tax permits for each of the states in which it operates. INDEPENDENT CONTRACTOR shall purchase sufficient fuel in each state it runs in on behalf of the CARRIER under this Agreement to pay that State's fuel tax. Where INDEPENDENT CONTRACTOR fails to purchase sufficient fuel in each State, CARRIER shall have the right to charge back the full amount of any resulting fuel tax liability in any state in which this occurs from any settlements or escrow owed or owned by INDEPENDENT CONTRACTOR.

INITIALS

**YANKEE FREIGHT SYSTEMS LLC**
**2717 S13TH AVE**
**Broadview, IL, 60155**
**Tel: 708-523-0550  Fax: 708-897-8924**

c.        **MAINTENANCE REPORTS**

1.)   To enable CARRIER to fulfill its obligations under DOT regulations to  monitor the  inspection, maintenance and repair of equipment operated under its authority, INDEPENDENT CONTRACTOR agrees to provide CARRIER with monthly vehicle maintenance reports on each unit of leased equipment provided to  CARRIER  hereunder,not  later than the 15th  day  of  the  month for the previous  month.     The  reports  shall specify all maintenance and  repairs performed  on the  vehicle(s)  and  shall be supportedby paid receipts.

2.) INDEPENDENT CONTRACTOR must submit a Vehicle Inspection Report prior to completion of this Agreement. INDEPENDENT CONTRACTOR shall submit the same Vehicle Inspection Report every _____ months. CARRIER  shall  have the  right to remove any unit of leased  equipment fromservice when unsafe conditions are found by DOT Inspection or otherwise.

3.) INDEPENDENT  CONTRACTOR's failure to  provide the  Monthly  Vehicle Report (maintenance and fuel receipts) will result in  the  applicable leased  unit  being placed  on an "out of service"  or "no load" list at the CARRIER'S offices, and a resulting fine of $100.00 for Non- Compliance shall be assessedon a weekly basis until such time as the  missing Reports are submitted. Additionally, all leases units that receive any "Out of Service" will be charged as per Charge and Bonus List.

CARRIER reserves the right to make changes to the above fine policies at their discretion. Any further major violations and negligent acts of any driver will result in a more serious disciplinary action like suspension and/or termination.

d.  **MINIMUM TRIPS**

CARRIER does not guarantee, warrant, or represent to INDEPENDENT CONTRACTOR that any minimum number of trips will be available to INDEPENDENT CONTRACTOR during the term of this Agreement however all good faith and effort of the CARRIER will be made to ensure as many trips as possible.

INITIALS 

8 |

**YANKEE FREIGHT SYSTEMS LLC**
**2717 S13TH AVE**
**Broadview, IL, 60155**
**Tel: 708-523-0550   Fax: 708-897-8924**

### e.   VEHICLE IDENTIFICATION

CARRIER will provide to INDEPENDENT CONTRACTOR all identification required by all applicable government authority, to be affixed to each vehicle listed in Section XIV, while such equipment is performing services for CARRIER, pursuant to this Agreement. When the leased equipment is not being used to perform services for the CARRIER, INDEPENDENT CONTRACTOR must remove or completely cover all items of identification referring to CARRIER. Upon termination of this Agreement, by either party, or upon INDEPENDENT CONTRACTOR leasing the equipment to another certified carrier.

INDEPENDENT CONTRACTOR will be responsible to completely remove all identification of CARRIER from its equipment, and to return the remnants of signs, and the permits, binders, stickers, plates, etc. to the CARRIER. Responsibility for removing the signs is solely that of the INDEPENDENT CONTRACTOR however proof of removal must be submitted to CARRIER. Failure to remove identification of CARRIER'S identification and its belongings from the unit (binder, permits, plates, etc.) shall result in the absolute forfeiture of any amounts being held in escrow and/or any monies yet due to INDEPENDENT CONTRACTOR from completed trips with proper paperwork submitted.

### X.   INSURANCE

The respective obligations of the parties concerning the purchase and maintenance of insurance are as follows:

1.) CARRIER agrees to procure and maintain a full force Public Liability Insurance Policy for bodily injury and property damage for the vehicle(s) leased hereunder, with a limit of

> $1,000,000.00 combined single limit for bodily injury and property damage in each accident. It is further agreed that this Public Liability Insurance shall NOT cover the operation of any unit of leased equipment while:

>> A.) The unit is used to carry property in any business other than the business of the CARRIER;

>> B.) The unit is being used in the business of any person or organization other than the CARRIER; or

>> C.) The unit is being used for personal purposes.

2.) CARRIER further agrees to provide cargo insurance covering operation of the leased equipment when being used to transport the cargo of CARRIER and its clients, broker, agents and assigns, under the provisions of this Agreement, and vouchering cargo loss or damage resulting from collision or upset of the equipment not due to INDEPENDENT CONTRACTOR or INDEPENDENT CONTRACTOR'S driver's negligent misconduct. CARRIER agrees to procure and maintain in full force and full effect the cargo insurance for equipment specified in the List of Equipment Leased. Cost of said insurance is to be reimbursed from INDEPENDENT CONTRACTOR to CARRIER in the amount of _____

INITIALS 

9 |
**YANKEE FREIGHT SYSTEMS LLC**
**2717 S13TH AVE**
**Broadview, IL, 60155**
**Tel: 708-523-0550   Fax: 708-897-8924**

per leased unit per month. Upon resignation, INDEPENDENT CONTRACTOR agrees to notify CARRIER before the first of the month (on a business day) of the upcoming month in order to avoid being charged for the following month's insurance premium. The limits of coverage and the placement of liability and cargo insurance shall be left to the sound discretion of CARRIER, and CARRIER shall be named as sole insured. If the INDEPENDENT CONTRACTOR desires any such insurance for his own protection (from Acts or negligence of their driver(s) or is dissatisfied with the type or amount of coverage provided by the CARRIER, he/she is free to provide other, further or additional insurance at his/her own expense. INDEPENDENT CONTRACTOR will be responsible for any such deductible amount for claims under the Public Liability and/or Cargo insurance when it is found to be the fault of the INDEPENDENT CONTRACTOR or his/her employees/contract drivers. Any claims that are not covered under CARRIER'S policy of PUBLIC LIABILITY AND/OR CARGO INSURANCE, due to the negligent misconduct or acts of INDEPENDENT CONTRACTOR or INDEPENDENT CONTRACTOR'S employees/contract drivers, shall be charged against any/all sums due to INDEPENDENT CONTRACTOR currently held by CARRIER.

3) INDEPENDENT CONTRACTOR agrees to procure and pay the full expense of Non-Trucking insurance, as well as Physical Damage Insurance on each unit of leased equipment. These insurance policies will be available through CARRIER, if INDEPENDENT CONTRACTOR doesnot provide evidence of both Non-Trucking Liability and Physical Damage Insurance on each unit bound by this Agreement.

### XI    CHARGE BACK ITEMS

In addition to the chargeback or withholding authority granted by INDEPENDENT CONTRACTOR to CARRIER elsewhere in this Agreement, INDEPENDENT CONTRACTOR agrees that CARRIER shall have theright to charge against any settlement owed under this Agreement amounts sufficient to reimburse.

CARRIER for the following expenses which CARRIER may incur on behalf of or in the name of theINDEPENDENT CONTRACTOR.

1.) Any fines or penalties imposed upon CARRIER as a result of violations by INDEPENDENT CONTRACTOR or INDEPENDENT CONTRACTOR'S employees/contract drivers.

2.) Any losses or expenses incurred by CARRIER as a result of its inability to collect freight charges earned due to INDEPENDENT CONTRACTOR'S or INDEPENDENT CONTRACTOR'S employees/contract driver's failure to properly complete the load

INITIALS 

**YANKEE FREIGHT SYSTEMS LLC**
**2717 S13TH AVE**
**Broadview, IL, 60155**
**Tel: 708-523-0550  Fax: 708-897-8924**

and/or to submit proper and complete signed paperwork and documents (including assessorial charges) in a timelymanner or not at all.

3.) Any loss or damage to property or cargo, or any other losses or expenses which CARRIER may incur or for which it may be held liable as a result of the INDEPENDENT CONTRACTOR'S or INDEPENDENT CONTRACTOR'S employee's/ contract driver's conduct.

4.) All fines and penalties on overweight trailers, found to be the fault of driver negligence. Prior to withholding any settlements, upon request, CARRIER shall provide INDEPENDENT CONTRACTOR with a written explanation and itemization of the withholding to be made.

5.) Deductible amounts on claims against liability and cargo insurance policies when it is foundto be the fault of INDEPENDENT CONTRACTOR or his employees/contract drivers in an amount of $2500.00 per EACH CLAIM.

6.) For a trailer left unhooked (and unattended), INDEPENDENT CONTRACTOR is responsible for any/all costs including towing charges, storage charges, loss of or damage to cargo, loss ofor damage to the trailer itself (physical damage) in addition to any/all legal and/or attorney fees rendered necessary to retrieve or recoup any/all losses to said trailer.

7.) In case that INDEPENDENT CONTRACTOR fails to provide funds for covering expenses for repairs, maintenance, towing and such, CARRIER may cover mentioned expenses per CONTRACTORS request. As of collateral CONTRACTOR will provide original title of leased equipment. Carrier reserve the right to retain the title and possession of the equipment until the debt is paid off. If Termination of Agreement occurs, Carrier reserve the right of repossession the equipment. Carrier will hold the title at least 60 days prior to transferring it to its own name, with right to sell the equipment.

### XII.    ACCIDENT REPORTS AND LITIGATION

INDEPENDENT CONTRACTOR agrees that he will report to CARRIER, by telephone, immediately after the occurrence of any accidents, injuries, property damages and cargo shortages or losses of any nature. A police report must be submitted to CARRIER along with a full, written accident report form, covering each occurrence as required by the I.C.C. and D.O.T. Regulations.

INDEPENDENT CONTRACTOR agrees to place himself, his agents and attorneys at the service and

INITIALS 

**YANKEE FREIGHT SYSTEMS LLC**
**2717 S 13TH AVE**
**Broadview, IL, 60155**
**Tel: 708-523-0550   Fax: 708-897-8924**

disposal of the CARRIER during the length of this Agreement and through termination, to assist CARRIER in defense of any/all claims or suits arising out of any operation or conduct which INDEPENDENT CONTRACTOR or INDEPENDENT CONTRACTOR'S employees/contract drivers in which they engaged under the provisions of this Agreement. INDEPENDENT CONTRACTOR also agrees that in all cases where a controversy arises with a Shipper or Consignee concerning the responsibilities for entire, or an amount of freight or freight loss or damage, INDEPENDENT CONTRACTOR will accept any/all decisions and settlements made by the CARRIER. CARRIER agrees to exercise due diligence in making such decisions and settlements.

### XIII.    TERMINATION OF AGREEMENT

Upon termination of this Agreement, INDEPENDENT CONTRACTOR shall remove all CARRIER identification from the outside of the unit(s) and return all company property including, but not limited to, fuel cards, signs removed from the unit(s) (this means bringing pieces removed to show proof of removal or a picture of the unit with the signs clearly removed) permits, decals, insurance documents, truck binders, I-Pass equipment, ELD equipment and/or any company documents in general (including all Bills of Lading and/or assessorial receipts, not previously turned in to the accounting department.

Upon return of these items, CARRIER will execute a written receipt for the return of said leased equipment to INDEPENDENT CONTRACTOR.

IN WITNESS WHEREOF, INDEPENDENT CONTRACTOR and CARRIER have caused this Agreement to be subscribed by their duly authorized representatives.

_Pavic R_                                    _2/29/24     15:30_

YANKEE FREIGHT SYSTEMS LLC                   DATE:            TIME:

_DOI7ll_                                     _2/29/24   15:40_

INDEPENDENT CONTRACTOR                       DATE:            TIME:

This Agreement shall be executed in duplicate. INDEPENDENT CONTRACTOR shall keep one copy of the Agreement on each unit of leased equipment during the period of this Agreement. CARRIER shall keep the originally executed Agreement.

INITIALS 

**YANKEE FREIGHT SYSTEMS LLC**
**2717 S13TH AVE**
**Broadview, IL, 60155**
**Tel: 708-523-0550   Fax: 708-897-8924**

### XIV.    IDENTIFICATION OF EQUIPMENT

| Tractor/trailer# | Make/Year | Model | VIN# | LICENSE | LICENSE STATE |
|---|---|---|---|---|---|
| 405 | Freighliner 2015 | Cascadia | 3AKJGLD57FSGB1203 | | IL |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

RECEIPT OF EQUIPMENT-TO BE COMPLETED ON TERMINATION OF AGREEMENT:

CARRIER hereby acknowledges receipt of the equipment described above:

_Pavic R._____ (YANKEE REP)     _2/29/24_____ (Date)

_D. D f_____ (INDEPENDENT CONTRACTOR) _2/29/24_____ (Date)

INDEPENDENT CONTRACTOR hereby acknowledges receipt of the equipment described in this Agreement.

### <u>RULES OF CONDUCT FOR ALL INDEPENDENT CONTRACTORS AND/OR THEIR</u>
### <u>EMPLOYEES/CONTRACT DRIVERS</u>

1.    All drivers must complete a Pre-Trip Inspection on the tractor and trailer according to D.O.T. Regulations. CARRIER must be notified promptly of any problems noticed during the Pre-Trip inspection. In the case of any truck or trailer equipment failure, CARRIER must be informed **IMMEDIATELY.** CARRIER will not acknowledge any actions taken by the driver prior to informing CARRIER, and any equipment damage due to neglect of the driver will be considered the responsibility of the driver, and will NOT be compensated by CARRIER.

INITIALS 

**YANKEE FREIGHT SYSTEMS LLC**
**2717 S13TH AVE**
**Broadview, IL, 60155**
**Tel: 708-523-0550   Fax: 708-897-8924**

2.  If a load requires refrigeration, the driver must check the condition of the trailer every eight (8) hours, including temperature requirements by Broker or Shipper, as well as fuel levels in the trailer. CARRIER will not be held responsible for damaged cargo due to negligence of the driver (including setting the wrong temperature or setting controls) and/or improper inspection and reporting (of any issues) by driver. Any deducted charges against the load for these issues or losses, by Broker to CARRIER, will be withheld from INDEPENDENT CONTRATOR'S subsequent settlements.

3.  All drivers are required to keep a logbook, up-to-date, for each portion of the trip. All logbooks must be completed and turned in to the CARRIER upon the driver's return to the office and kept on file according to D.O.T. regulations. The driver, not CARRIER, will pay any logbook violations If a truck is ordered Out of Service due to logbook violations (or ELD violations), each driver will be fined according to Charge and Bonus List by the CARRIER. If a load is not picked up or delivered on time, due to a Police Order or any other reason (except extreme emergencies), unless approved by Broker or Shipper/Consignee, all late charges incurred as a result of the late pick up or delivery that are charged against CARRIER shall be withheld from INDEPENDENT CONTRACTOR'S future settlement(s).

4.  All drivers must inspect the loading of the trailer, where allowed, and check their weight at the nearest scale. If the load appears to be overweight, the driver must inform CARRIER **IMMEDIATELY,** by phone, and return to the original loading area for proper weight or weight distribution. CARRIER will NOT pay for any Citations resulting from overweight violations.

5.   During loading, the driver must pay attention to the condition of the load, the number of pallets or boxes placed in the trailer, and any special features added by Shipper

{including pillows, curtains, block & bracing, load locks, straps). It is driver's responsibility to refuse to sign for the freight if the freight appears to be damaged in any nature whatsoever, or if the loading of the freight is improper in any nature whatsoever, or if the load count does not match written or verbal instructions given by dispatch. If freight appears to be missing, improperly loaded or damaged, in any nature whatsoever, driver must IMMEDIATELY notify their dispatch to afford an opportunity for dispatch to discuss the situation and potential resolution with the Broker and/or the Shipper or Receiver. If CARRIER approves of the load continuing to be moved, or to continue with specific instructions that must be performed by driver or Shipper/Receiver, the driver must note any damage or inconsistency on the Bill of Lading AND MUST OBTAIN A SIGNATURE FROM SHIPPER/RECEIVER'S REPRESENATIVE, as proof and acknowledgement of the noted damage to the load prior to transit or leaving.

6.  At all times, drivers must be courteous and respectful of all parties (at Shipper/Receiver) and respectful and mindful of their rules and regulations, and of other drivers and offices of all regulatory agencies.

INITIALS 

**14 |**

**YANKEE FREIGHT SYSTEMS LLC**
**2717 S13TH AVE**
**Broadview, IL, 60155**
**Tel: 708-523-0550   Fax: 708-897-8924**

7. Causes for IMMEDIATE DISCHARGE include (but are not limited to) the following:

- Dishonesty
- Immoral conduct while on duty
- Fighting
- Possession of Narcotics, or being under the influence of alcohol or drugs while on duty (except those proscribed by a medical doctor which are determined to be allowed while on duty according to D.O.T. Rules and Regulations)
- Failure to immediately report an accident or incident which results in injury or property damage (of any nature whatsoever)
- Failure to carry out instructions or a direct order of a supervisor
- Theft (of any nature whatsoever including, but not limited to, cargo theft, equipment theft etc.)
- Participating in any activity(s) that interferes with the CARRIER'S operation.

I HAVE READ AND UNDERSTOOD THE CARRIER'S RULES AND DO HEREBY AGREE TO FOLLOW THEM

_D̸ 217 ℓ_

INDEPENDENT CONTRACTOR NAME & SIGNATURE

DATE  _2/29/24_

_Radisav Pavic / Pavic R_

YANKEE REPRESETATIVE NAME & SIGNATURE

DATE  _2/29/24_

INITIALS 

Exhibit B



**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**GREENVILLE DIVISION**

In the Matter of:                                    **Chapter 11**
**LEGACY ENTERPRISES OF**                    **Case No.: 24-03477-5-JNC**
**NORTH AMERICA, LTD**
     **Debtor**

<u>**ORDER GRANTING**</u>
<u>**MOTION FOR ORDER DIRECTING**</u>
<u>**R1 TRUCK REPAIR AND  YANKEE FREIGHT, LLC,**</u>
<u>**TO APPEAR AND SHOW CAUSE**</u>

THIS Matter having come before the court upon Legacy Enterprises of North America, LTD's ("Debtor") Motion for Order Directing R1 Truck Repair ("R1") and Yankee Freight, LLC ("Yankee") to Appear and Show Cause ("Motion") and it appearing to the Court that proper notice was provided to the parties in interest, and no objections having been filed; and it further appearing that sufficient cause has been shown; therefore, makes the following FINDINGS OF FACT and CONCLUSIONS OF LAW:

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 151, 157, and 1334. This matter is a core proceeding pursuant to 28 U.S.C. §157, and the Court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334. The Court has the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984, by the United States District Court for the Eastern District of North Carolina.

2.      On or about October 4, 2024, Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Petition Date") [Doc. No. 1].

3.      R1 and Yankee were served with the Petition.

4.     On October 8, 2024, BMO Harris Bank ("BMO") filed a secured claim [Clm. No. 1] in the amount of $47,517.99 asserting a lien on trucks ending in VIN Nos. 4067 and 4059.

5.     On October 22, 2024 Hunting National Bank ("Huntington") filed a secured claim in the amount of $292,415.81, asserting a lien on trucks ending in VIN Nos. 5808, 5810, 5812. [Clm. No. 3]

6.     Debtor is party to an unexpired pre-petition contract with Yankee for the leased use of a 2015 Cascadia freightliner truck ending in VIN 1203 ("2015 C Freightliner").  Debtor leased the 2015 C Freightliner to Yankee and as part of that lease agreement provided Yankee with title to the 2015 C Freightliner.  A true and accurate copy of the Yankee Lease was attached to the Motion as **Exhibit A**.

7.     As of this filing of this Motion, none of the Possessing Parties have filed a Proof of Claim.

8.     On November 20, 2024, Debtor filed a Motion for Turnover of Property of the Bankruptcy Estate (the "R1 Turnover Motion"). [Doc. No. 31]

9.     No Responses to the R1 Turnover Motion were filed.

10.     On December 11, 2024, the Court entered its Order Granting the R1 Turnover Motion (the "R1 Turnover Order"). [Doc. No. 38]

11.     The R1 Turnover Motion requests and the R1 Turnover Order orders the turnover of property of the estate, including the following 2017 Freightliner trucks:

VIN 3AKJGLDR6HDHN5808,

VIN 3AKJGLDR4HDHN5810,

VIN 3AKJGLDR8HDHN5812,

VIN 3AKJGDR7HSHU4067, and

VIN 3AKJGLDR8HSHU4059

(The Freightliner trucks with VINs ending in 5810, 5808, 582, 4067, and 4059 may be referred to collectively hereinafter as the "Seized Trucks").  Huntington has a lien on three of the Seized Trucks ending in VINs 5808, 5810, and 5812.   BMO has a lien on the Seized Trucks ending in VINs 4059 and 4067.

12.     The time in which to appeal the R1 Turnover Order has run and no appeal has been taken from this Court.

13.     On information and belief the Possessing Parties are related companies in that they

share a physical site location, and they share an office space. A true and accurate photograph of the shared office space and site location was attached to the Motion as **Exhibit B.**

14.     On further information and belief, the Possessing Parties continue to retain possession and control of all of the "Seized Trucks," owned by Debtor and property of the bankruptcy estate, for the benefit of BMO, Huntington, and/or Yankee.

15.     Debtor has no knowledge as to why or how Yankee is in possession and/or control of any of its Freightliners, other than the 2015 C Freightliner, which is not among the Seized Trucks.

16.     On Friday, December 27, 2024, at 4.25 p.m. Debtor spoke with Nikola Radojlovic ("Mr. Radojlovic"), who holds himself out as being the owner of Yankee along with a partner or associate who is referred to as "Nik." Mr. Radojlovic informed Debtor that a third-party, who he would not disclose, was negotiating recovery of the Seized Trucks between BMO and Huntington.

17.     Also on Friday, December 27, 2024, Mr. Radojlovic referred Debtor to the purported manager of R1, Nemo. Debtor has previously communicated with Nemo in person and via text message, and Nemo has consistently claimed to have no information about the Seized Trucks and has further indicated to Debtor that he does not wish to discuss the Seized Trucks with Debtor.

18.     Debtor has personally witnessed all of the Seized Trucks on site at the R1 location in Broadview, Illinois ("R1 Site"). Photographs taken by the Debtor on November 11 and 13 at the R1 Site demonstrate that the trucks ending in VINs 5810, 5808, and 4059 are located at the R1 Site. True and accurate photographs of the Seized Trucks were attached to the Motion as **Exhibits C** through **F**.

19.     The R1 Site acts as a truck service yard for Yankee. All Possessing Parties have access to the Seized Trucks.

20.     On information and belief, Yankee has access to and control of the Seized Trucks.

21.     On information and belief, Yankee is utilizing the Seized Trucks by allowing other businesses/truck drivers access and use for purposes that do not benefit the Debtor or the bankruptcy estate, including diminishing their value via adding mileage and general wear and tear.

22.     On further information and belief, some of the Seized Trucks have been re-branded with "Yankee" insignia. Debtor has seen two of the R1 Trucks with Yankee insignia, including the truck ending in VIN 5810.

23.     On information and belief, Yankee along with R1 are actively working to hide and

utilize Debtor's assets and property of the bankruptcy estate, at the R1 Site.

24.    As of the date of this pleading, R1 has refused to turnover Debtor's assets in violation of the R1 Turnover Order.

25.    On information and belief, Possessing Parties are retaining possession of the Seized Trucks in bad faith.

26.    On further information and belief, Possessing Parties are acting to deceive Debtor and this Court, by hiding these assets from Debtor and allowing others access to and use of the Seized Trucks for the benefit of Possessing Parties.

27.    Section 105(a) of the Bankruptcy Code authorizes bankruptcy courts to issue orders or make any determination necessary to enforce, implement, or prevent an abuse of the provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure. See *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365 (2007) (holding that § 105(a) grants bankruptcy courts "broad authority . . . to take any action that is necessary or appropriate 'to prevent an abuse of process.'" (citation omitted); 11 U.S.C. § 105(a). "This includes the issuance of sanctions for violation of a court order[.]" *In re Kirkbride*, Case No. 08-00120-8-JRL, 2010 WL 4809334, at *3 (Bankr. E.D.N.C. Nov. 19, 2010) (citing *In re Adams*, 2010 WL 2721205, at *4 (Bankr. E.D.N.C. July 7, 2010) aff'd, No. 5:10-CV-340-BR (E.D.N.C. Jan. 24, 2011)).

28.    Apart from § 105(a) and similar to their Article III counterparts, bankruptcy courts "enjoy inherent power to sanction parties for improper conduct." *Mapother & Mapother, P.S.C. v. Cooper (In re Downs)*, 103 F.3d 472, 477 (6th Cir. 1996). Pursuant to its inherent contempt powers, a bankruptcy court may sanction conduct "which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). Conduct abusive of the judicial conduct includes "bad faith conduct" and "willful disobedience of a court order." *Id.* at 45-46; *see Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) (emphasizing that, in addition to vexatious, wanton or oppressive conduct, bad faith conduct includes "hampering enforcement of a court order").

29.     Bankruptcy courts "have inherent contempt powers in all proceedings, including bankruptcy, to 'achieve the orderly and expeditious disposition of cases.'" *Jove Eng'g, Inc. v. IRS (In re Jove Eng'g, Inc.)*, 92 F.3d 1539, 1553 (11th Cir. 1996) (citation omitted).  To enforce and carry out the provisions of their orders and the Bankruptcy Code, courts have the authority to "issu[e] sanctions in the form of 'actual damages, attorney's fees, and when appropriate, punitive damages.'" *Kirkbride*, 2010 WL 4809334, at *3 (quoting In re Cherry, 247 B.R. 176,187 (Bankr. E.D. Va. 2000)); see, e.g., *Am. Airlines Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir. 2000) ("Judicial sanctions in civil contempt proceedings, may in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained.").

30.     Possessing Parties' concerted efforts to violate the Court's R1 Turnover Order are egregious, eviscerating the size and capacity of Debtor's trucking fleet from five operating freightliners down to one operating freightliner.

31.     Possessing Parties are not in the military service.

32.     Possessing Parties are not infants, incompetent persons, or otherwise under disability.

33.     There is no fair ground of doubt that that the failures of Possessing Parties, detailed herein, violate the orders of this Court.  *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019); accord *Beckhart v. Newrez LLC*, 31 F.4th 274 (4th Cir. 2022).

34.     Possessing Parties have engaged and will continue to engage in conduct demonstrating a willful disregard for the orders of this Court.

35.     Based upon the foregoing, and for the reasons set forth herein, Debtor is entitled to entry of an Order requiring Possessing Parties to appear and show cause as to why they should not be held in contempt and have sanctions imposed by the Bankruptcy Court based upon their willful,

continued, and ongoing failure to comply with the terms and provisions of the R1 Turnover Order.

**IT IS HEREBY ORDERED:**

1.      That R1 appear and show cause as to why it failed to comply with the R1 Turnover Order;

2.      That Yankee appear and show cause as to why it should not be held in civil contempt;

3.      That an award attorney's fees to Debtor is granted;

4.      That the costs of this action and in prosecuting this Motion to Show cause be taxed against the Possessing Parties; and

5.      That Debtor's counsel shall file with the court an affidavit of its fees and costs associated with this action and in prosecution of this Motion;

**"End of Document"**